## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LYNDA HALVERSON SELAN, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 10 CV 7223 |
| v. | ) | |
| | ) | |
| VALLEY VIEW COMMUNITY UNIT | ) | |
| SCHOOL DISTRICT 365-U, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Lynda Halverson Selan ("Selan") has sued Valley View Community Unit School District 365-U ("District"), where Selan had worked as a teacher. Selan asserts four theories of recovery under the Americans with Disabilities Act ("ADA"): disparate treatment (Count I), hostile work environment (Count II), failure to accommodate (Count III) and retaliation (Count IV).

After the parties completed discovery District filed a motion for summary judgment on all four counts, and the litigants have briefed the issues fully. For the reasons stated below, District's motion is granted as to Counts I, II and IV and denied as to Count III.

### Standard of Review

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). For that purpose courts consider the entire evidentiary record and must

1

view all of the evidence, together with all reasonable inferences drawn from that

evidence, in the light most favorable to nonmovants (<u>Egan Marine Corp. v. Great

Am. Ins. Co. of N.Y.</u>, 665 F.3d 800, 811 (7th Cir. 2011)).  But a nonmovant must

produce more than "a mere scintilla of evidence" to support the position that a

genuine issue of material fact exists and "must come forward with specific facts

demonstrating that there is a genuine issue for trial" (<u>Carmichael v. Vill. of

Palatine, Ill.</u>, 605 F.3d 451, 460 (7th Cir. 2010), quoting <u>Wheeler v. Lawson</u>, 539

F.3d 629, 634 (7th Cir. 2008)).  As <u>Payne v. Pauley</u>, 337 F.3d 767, 772-73 (7th Cir.

2003) has explained:

> [T]he Federal Rules of Civil Procedure require the nonmoving party to
> "set forth specific facts showing that there is a genuine issue for trial."
> Fed. R. Civ. P. 56(e).  Conclusory allegations, unsupported by specific
> facts, will not suffice.

Ultimately summary judgment is warranted only if a reasonable jury could not

return a verdict for the nonmovant (<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,

248 (1986)).

## Compliance with LR 56.1[1]

---

[1] This opinion cites District's LR 56.1 statement as "D. St. ¶--," Selan's LR
56.1 statement as "S. St. ¶--," District's Response to Selan's LR 56.1 Statement as
"D. R. St. ¶--" and  Selan's Response to the District's LR 56.1 Statement as "S. R. St.
¶--."  Where a response does not provide a version of the facts different from the
original statement, this opinion cites only that original statement.  Due to the
confusing nature of some of the submissions, exhibits will sometimes be
accompanied by a reference to their respective docket numbers.  Citations to Selan's
Memorandum take the form "S. Mem. --" and citations to District's Reply
Memorandum take the form "D. R. Mem. --."  Finally, references to the First
Amended Complaint (Dkt. 5) take the form "Compl. ¶--."

Before the facts of the case are addressed it is necessary to speak briefly about the litigation's recent history. All of the materials submitted by Selan's counsel in opposition to summary judgment reflect not only their complete noncompliance with LR 56.1 but also his misunderstanding of the summary judgment standard itself (see S. Mem. 3-4).

District submitted its motion for summary judgment on August 9, 2012. After this Court rejected Selan's belated attempt to file a Second Amended Complaint on August 27 and gave Selan's counsel extended time to respond to District's motion (extensions were granted until October 8--a full two months), October 10, 11, 12 and 17 saw the delivery of an untimely and jumbled compilation of documents in complete noncompliance with LR 56.1 (see Dkt. Nos. 5-91). District was given until November 16 to submit its reply.

On November 14 Selan's counsel--apparently realizing at least some of the flaws in his original submissions--submitted a baffling "Motion for Leave to Amend/Correct Response to Local Rule 56.1 Statement in Opposition to Defendant's Motion for Summary Judgment," accompanied by an entirely new set of disjointed documents and exhibits (see Dkt. Nos. 95-97). That troubling motion was denied orally on November 16, for (1) it would have caused substantial prejudice to District and (2) Selan's counsel had already had more than an adequate opportunity to make his submissions.

Thus Selan's original submissions in opposition to summary judgment (Dkt. Nos. 75-91) stand. Although this Court has done its best to penetrate the maze for

3

interpretive and analytical purposes, many essential flaws remain. While it is unfortunate that those flawed submissions might possibly impact the substantive outcome adversely (though this Court does not believe that to have been the case), this Court is well within its discretion to penalize a party for noncompliance with the local rules ( see, e.g., <u>Cichon v. Exelon Generation Co., L.L.C.</u>, 401 F.3d 803, 809-10 (7th Cir. 2005) and numerous cases cited there). Mere grammatical and typographical mistakes are certainly forgivable, but if a nonmovant fails to point out any genuine issues of material fact it is not this Court's job to invent them or to sift through hundreds of pages of documents "like pigs hunting for truffles" (<u>United States v. Dunkel</u>, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam)). Accordingly, when a response is completely noncompliant with LR 56.1 this Court is entitled to disregard that response or to consider a matter admitted (<u>Ammons v. Aramark Unif. Servs., Inc.</u>, 368 F.3d 809, 817-18 (7th Cir. 2004)).[2]

Thus responses in purported opposition to a movant's properly supported statements but providing absolutely no supporting citation (see, e.g., S. R. St. ¶24), or only an extremely vague or incomprehensible citation (see, e.g., <u>id.</u> ¶19 n. 2[3]), call

---

[2] This opinion will not waste space listing every defect in Selan's response, although District has laid out a relatively detailed explanation in its reply (D. R. Mem. 3-7). But as the following paragraph in the text reflects, the Statement of Facts in the next section has disregarded Selan's improper denials and assertions where appropriate.

[3] There, for example, Selan cites only "Depo. Pierson" with no page number or exhibit identifier. Such a citation to a 112 page deposition with no page number (let alone line numbers) is totally irresponsible (<u>Ammons</u>, 368 F.3d at 817-18).

for the admission of the movant's statements. Additionally, statements that

introduce new and unsupported facts that are purportedly in response to a

statement dealing with an entirely different subject matter will be disregarded (see,

e.g., id. ¶20). Although it is the client such as Selan who ultimately bears the

consequences of such lawyer deficiencies, the Supreme Court spoke to that problem

fully a half century ago in <u>Link v. Wabash Railroad</u>, 370 U.S. 626, 633-34 (1962)

(internal quotation marks omitted):

> Petitioner voluntarily chose this attorney as his representative in the
> action, and he cannot now avoid the consequences of the acts or
> omissions of this freely selected  agent. Any other notion would be
> wholly inconsistent with our system of representative litigation, in
> which each party is deemed bound by the acts of his lawyer-agent . . . .

## Statement of Facts

Beginning in 2006 (Compl. ¶4)  Selan was employed as a special education

teacher at Hubert H. Humphrey Middle School ("the School") (D. St. at 1).

Throughout the course of her employment Selan suffered from several disabilities,

including Bipolar Disorder, Attention Deficit Disorder ("ADD"), diabetes and

Obsessive Compulsive Disorder (S. St. ¶7).

Selan's duties at the School involved teaching a special education class in a

regular sized classroom, with one para-educator and one other teacher assigned to

use the room during her planning period (id. ¶11). Selan claims that her duties

were interrupted when at least two additional teachers used her classroom as a

"personal office" at times when she was teaching (id.).[4]  According to Selan the

teachers would "eat their lunch during her lessons, talk on the phone and even

directly interject themselves into the lesson" (id.).

Selan claims that those interruptions "greatly exacerbated Plaintiff's

disabilities" and interfered with the performance of her duties (id.), and Kathy

Ficorotta (a special education secretary) testified that she witnessed Selan have

some kind of a breakdown in response to her teaching conditions (id. ¶22).  After

that "breakdown" Selan was approved for 12 weeks of Family and Medical Leave

Act ("FMLA") leave beginning in January 2009[5] and ending on April 15 (D. St. ¶51).

When Selan went on leave she was replaced by Carolyn Norton, a non-disabled

substitute teacher (id. ¶19).  Norton was assigned to the same room as Selan where

the same three other teachers were also located (id. ¶¶19-20).  Norton complained to

the District about the three additional teachers, but they were not removed from

the classroom (S. St. ¶¶32, 44; D. R. St. ¶¶32, 44).

On January 12 Selan had a telephone conversation with District's Assistant

Superintendent for Human Resources Chris Israelson ("Israelson") about her

inability to return to work under the then-current conditions (D. St. ¶¶10, 15).

---

[4]  Selan provides no citation for those claims in her Statement of Facts ¶11,
and as already discussed her statements are noncompliant with LR 56.1.  But for
the sake of providing context, this opinion will include them without necessarily
accepting them as true.

[5]  All further dates set out without a year designation also refer to 2009
occurrences.

Before then Selan had never specifically discussed her disabilities with anyone in District's administration (id. ¶14), although she claims that she had discussed her general work-related issues with members of the administration (S. R. St. ¶14). Next day Selan and her husband met with Israelson (D. St. ¶16), and Selan identified her disability as ADD and requested a transfer to another open teaching position (id. ¶¶16-17). District claims that from January through May "no open teaching position existed for which Selan was qualified and into which she could have transferred" (id. ¶18 and Ex. 6 ¶19), though Selan disputes that claim (S. R. St. ¶18).

On February 25 Selan--accompanied by her union representatives and her personal representative from the Illinois Department of Human Services--met with Israelson and District's Executive Director for Human Resources to discuss Selan's accommodation requests (D. St. ¶¶12, 21). District claims that it used the meeting to offer Selan "various options and alternative accommodations in lieu of a transfer" (id. ¶21). Both sides agree that at the meeting Selan was asked to provide completed medical certifications (D. St. ¶22; S. R. St. ¶¶21-22).

That same group met again on March 20 to review the medical documentation of Dr. Rifki John Goldin-Mertogan, Selan's treating physician (D. St. ¶¶23-24). Dr. Goldin-Mertogan wrote District a letter on February 24 stating (D. St. Ex. 7 pt. 2 at 6, emphasis in the original):

> Due to the nature of her psychiatric symptoms, she can <u>not</u> cope with the <u>unnecessary</u> distractions in the classroom setting (i.e. other staff walking in and out of her classroom; staff having conversations with

other staff in her classroom; staff using office equipment such as fax
machines, photocopiers and computer printers in her classroom).

As such it is my professional opinion that it would be very beneficial to
Lynda (and her students) if <u>unnecessary</u> <u>distractions</u> were removed
from her classroom.

Dr. Goldin-Mertdogan then followed up that letter on March 23 with a note on a

prescription pad stating (D. St. Ex. 7 pt. 1 at 62; Ex. 7 pt. 2 at 1):

It is my professional psychiatric opinion that putting up a screen in
her classroom would not prevent other teachers from distracting Lynda
during the school day.  She requires a classroom environment which is
free of unnecessary distractions.

Despite those recommendations by Dr. Goldin-Mertogan, his physician

certificate form stated that Selan was "currently able to perform all the essential

job functions"of her position, and he answered "n/a" when asked to indicate "any

necessary accommodations to enable the employee to perform those functions," (<u>id</u>.

¶25).  Selan notes that Dr. Goldin-Mertogan's form did not have any indication

about the specific classroom issues about which she was complaining (S. R. St. ¶25).

District claims that Israelson interpreted Dr. Goldin-Mertogan's form to mean that

no accommodations were needed for Selan to return to work (D. St. ¶27).

At the March 20 meeting, however, Selan requested four accommodations:

(1) to remove the three teachers' work stations from her classroom, (2) to provide

her with assistance in applying for other teaching positions in another District

school, (3) to provide her with reasonable administrative support at the School and

(4) to give her access to certain supplies (<u>id</u>.  ¶29).  District claims that Israelson

offered Selan three accommodations in response:  (1) to meet with the School

administrative team to determine the feasibility of relocating the three teachers whose desks were in the classroom, (2) to install temporary screens or room partitions between the three desks and the rest of the classroom and (3) to modify the schedules of the teachers so that none of the other teachers had planning times during Selan's instructional periods (id. ¶30).  According to District, Selan was unwilling to accept those modifications, (id. ¶31), while for her part Selan disputes the reasonableness--the adequacy--of those proposals (S. R. St. ¶31).

On March 25 Israelson met with the School's administrative team to discuss Selan's proposed accommodations (D. St. ¶32).  According to District, relocations of any of the other teachers to other general education classrooms was not feasible because of size constraints (general education classrooms had 25-30 students, while Selan's classroom had 4-15 students) (id. ¶33; S. R. St. ¶34).  District also points out that under the other teachers' schedules there was only one instructional period when Selan was scheduled to be in the same room as multiple other teachers, although Selan disputes that the other teachers actually followed their assigned schedules (D. St. ¶35; S. R. St. ¶35).  District concluded that it was not feasible to move the other three teachers from Selan's room (D. St. ¶36).  Selan disputes the feasibility concerns and points out that certain other teachers had fewer students in their classrooms than she did (S. St. ¶30).

On April 1 Selan again met with representatives from her union and from District, including Israelson, Hawks, Angelo Armistead ("Armistead," the School's principal) and Andrea Pegues ("Pegues," the School's assistant principal) (D. St.

9

¶37). This time District offered Selan alternative accommodations: (1) to schedule her four instructional periods in classrooms other than the one she was currently sharing with the three teachers (an option that would require her to "work off the cart") or (2) to place temporary screens or room partitions (consisting of either a floor-to-ceiling panel or a six-foot high partition to create a visual barrier and sound dampening) in her current room and to request that the three other teachers work as quietly as was reasonable (id. ¶¶37, 39). District claims that Selan rejected both of these options (id. ¶40). At the same meeting District also offered to assist Selan in applying for open teaching positions within or outside District, to provide her with administrative support and to provide her with supplies needed to provide instruction to her students (id. ¶41).

On April 2 Selan sent Israelson an email stating that she had a better idea of how to allocate space for personnel at the School (id. ¶42). Israelson responded by asking Selan to respond to the accommodations offered at the April 1 meeting (id. ¶43). Selan emailed Israelson again on April 14 and once more requested that he look at how space was allocated for personnel at the School (id. ¶44). On April 16 Israelson, Hawks, Armistead and Pegues met to review the space allocations suggested in Selan's April 14 email and again determined that her proposals were not feasible (id. ¶¶45-46). On April 20 Israelson wrote to Selan, telling her that District was unable to adopt her proposed accommodations (id. ¶47). Israelson also once again asked Selan to review District's proposals and provide a response (id.). Selan did not respond to the letter (id. ¶48).

10

After Selan's FMLA leave expired on April 15, she was approved for a general unpaid leave of absence through the end of the 2008-09 school year (id. ¶¶51-52). As a result of taking more than her FMLA leave, Selan was put back on year one of her goal towards a tenure track, although the exact ramifications of that are in dispute (S. St. ¶¶2, 4; D. R. St. ¶¶2, 4). On June 23 Selan signed a contract for employment with the Board of Education of Taylor County, West Virginia (D. St. ¶69), and she resigned from District on August 12 (id. ¶70). Although Selan claims she was terminated, according to District she was never told that she was terminated and was never issued a Notice of Dismissal for the 2009-10 school year, (id. ¶¶53-54)--but Selan points out that Nancy Pierson (the special education supervisor at the School) testified that she had never before encountered a situation where a teacher who was expected to teach the following school year had not received an assignment by the summer (S. R. St. ¶54).

Selan filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in July 2009 and filed an amended charge of discrimination with EEOC on May 2, 2010 (D. St. ¶¶1-2). Selan was represented by counsel in the filing of both charges (id. ¶3). Selan did not file any internal complaint with District under its "EEO/harassment policy" (id.¶11). Then on November 9, 2010 Selan filed this action.

## Count I: Disparate Treatment

Selan first charges that the District treated her disparately on account of her disabilities. Timmons v. General Motors Corp., 469 F.3d 1122, 1127-28 (7th Cir.

11

2006) has discussed at length the test for an ADA disparate treatment claim:

> Accordingly, an ADA plaintiff in a disparate treatment case must show that he is protected by the ADA (a "qualified individual with a disability"[6]) and that his employer violated the ADA by taking adverse action against him because of his disability. . . . If he is protected by the ADA, the plaintiff may show he has been treated adversely because of his disability using either the direct method, which contemplates both direct and circumstantial evidence, or the indirect method. The indirect method requires a showing that: (1) the plaintiff was a qualified individual with a disability . . .; (2) he was meeting his employer's expectations . . .; (3) he was subjected to an adverse employment action; and (4) the circumstances suggest that the plaintiff's disability was the reason the employer took adverse action against him. The showing required under the fourth prong of the indirect method may (not must) be made by demonstrating similarly situated nondisabled employees were treated more favorably. If the plaintiff shows all four of these elements, the employer has the burden of showing a legitimate, nondiscriminatory reason for taking adverse action against the plaintiff. If the employer meets its burden, the employee must show the employer's stated reason is pretextual.

Selan has offered no evidence that would sustain a disparate treatment claim under the direct method of proof. Direct evidence requires either "an admission by the decisionmaker that his or her actions were based upon the prohibited animus" or circumstantial evidence such as "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action" (Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522, 657 F.3d 595, 601 (7th Cir. 2011)). Selan has offered

---

[6] [Footnote by this Court]: District does not dispute that Selan is "a qualified individual with a disability," so that issue will not be discussed.

nothing that even comes close to that standard.

As for the indirect method of proof, District first argues that there was no "adverse employment action" against Selan.  To demonstrate an adverse employment action, a plaintiff must have suffered "a materially adverse change in the terms and conditions of employment" and that change must have been "more disruptive than mere inconvenience or an alteration of job responsibilities" (Crady v. Liberty Nat'l Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir. 1993)). Selan's submissions make it somewhat unclear what the alleged adverse employment action is, but there would seem to be four possibilities: (1) an actual termination of employment, (2) a constructive termination of employment, (3) a failure to transfer and (4) a loss of tenure track status.[7]  Only the third and fourth of those are even arguably tenable.

As to the first, while a termination would obviously be an adverse employment action, Selan has not shown that her employment was ever actually

---

[7] Throughout her memorandum Selan presents a variety of other vague adverse action allegations, such as "cutting off all of her friends, after they showed her they could cut off her contract and leave her bewildered" (S. Mem. 27).  But "not everything that makes an employee unhappy is an actionable adverse action" (Kersting v. Wal-Mart Stores, Inc., 250 F.3d 1109, 1115 (7th Cir. 2001)(internal quotation marks omitted)), and "[p]ersonality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable" (Brown v. Advocate S. Suburban Hosp., No. 12-1135, 2012 WL 5870725, at *5 (7th Cir. Nov. 21)).  Those claims are thus clearly not adverse employment actions and will not be discussed further.

terminated.[8]  She admits that she never received any kind of written or oral

termination notice.  She argues that it can be assumed that she was terminated

because she was not given an assignment for the next school year, but she offers no

properly presented evidence that this was to be understood as an actual discharge.

As for the testimony of Nancy Pierson, she said only that she could not recall a

situation where a teacher had not received an assignment (Dkt. No. 6 Ex. 2 at 58).

She did not testify that she (or anyone else for that matter) understood that to be an

effective termination.  There is simply not enough evidence, even with reasonable

inferences in Selan's favor, to support a finding that Selan was actually terminated.

As to the second hypothetical possibility, that Selan suffered a "constructive

discharge" that constituted an adverse employment action, that too fails.

"Constructive discharge" is a term of art with a specific meaning that is not met

here (see Ekstrand v. Sch. Dist. of Somerset, 583 F.3d 972, 977-78 (7th Cir. 2009)).

In brief, "constructive discharge" in this context requires an employee to have

resigned due to discriminatory harassment or because a reasonable person would

have thought she was about to be terminated.  Plaintiff must identify conditions

---

[8] District argues that Selan was re-employed as a matter of law under 105 ILCS 5/24-11, which dictates that if the school board fails to give a teacher a termination notice "the employee shall be deemed reemployed" for the following school term (D. R. Mem. 13).  But District omits the rest of that sentence, which states: "and not later than the close of the then current school term the board shall issue a regular contract to the employee as though the board had reemployed him in the usual manner."  While it is true that Selan did not receive a termination notice, she also did not receive an employment contract, so that compliance with the statute is really not dispositive here.

even more egregious than those required for a "hostile work environment" claim
and must show that a reasonable person would find the situation intolerable
(Williams v. Waste Mgmt. of Ill., 361 F.3d 1021, 1032 (7th Cir. 2004)).  As will be
discussed in greater detail in the later analysis of  Count II, Selan has not shown
the requisite level of District's conduct to sustain a hostile environment claim,
which requires "severe and pervasive" abuse that is "both subjectively and
objectively hostile" (Silk v. City of Chicago, 194 F.3d 788, 804 (7th Cir.
1999)(internal quotation marks omitted).  Selan has not supplied facts (again even
with reasonable inferences) sufficient for such a showing.

Hence the only two adverse actions that could arguably be sufficient to
support a prima facie case for disparate treatment are the "failure to transfer" and
the loss of tenure track status.  And on both scores Selan again strikes out.

As for the first of those, the denial of an employee's request for a lateral
transfer that would not increase her pay or benefits is generally not an adverse
employment action unless it significantly reduces the employee's career prospects
(Dandy v. United Parcel Serv., Inc., 388 F.3d 263, 275 (7th Cir. 2004)).  Selan does
not make any claim that her desired transfer would increase her pay or benefits or
would constitute a promotion.  But with all reasonable inferences drawn in Selan's
favor, and with the added assumption that there were vacant positions available, it
might be said that such a transfer would benefit her career (or at least prevent the
detrimental effects of her current assignment).  And as for the second possibility,
Selan's loss of tenure track status obviously has a direct impact on her pay and

15

benefits and general career status. That might also be viewed as an adverse action.

But even on those most favorable potential readings of "adverse employment actions," Selan has failed to make the required showing that "the circumstances surrounding the adverse action indicate that it is more likely than not that [her] disability was the reason for it" (Timmons, 469 F.3d at 1126 (internal quotation marks omitted)). For that purpose a plaintiff must show that her disability was the but-for cause of the adverse employment action--"proof of mixed motives will not suffice" (Serwatka v. Rockwell Automation, Inc., 591 F.3d 957, 962 (7th Cir. 2010)).[9]

Here, even when Selan's assertions that she was mistreated by the extraneous teachers and denied accommodations by the administration are credited, she has offered no evidence of the key linchpin that she was victimized because of her disability. She has offered neither direct nor circumstantial evidence that shows any kind of animus towards disabled persons on the part of any District official. Indeed, it will be remembered that Carolyn Norton--the non-disabled substitute teacher who took over Selan's responsibilities when she went on FMLA leave--also had to cope with the three extraneous teachers in the same classroom

---

[9] Serwatka was decided based on pre-2008 ADA language that stated employers could not discriminate "because of" a disability, while this case is controlled by newer language from the 2008 amendments (effective as of January 1, 2009), which says that employers may not discriminate "on the basis of" a disability. Serwatka, 591 F.3d at 961-62 n.1 acknowledged the new language but declined to rule on whether it would have any effect on this "mixed-motive rule." In the several years since the new amendments were passed, our Court of Appeals has not spoken again on this issue. Because the language change is slight, this Court will adhere to the Serwatka holding until the Court of Appeals teaches otherwise.

and expressly complained about their activities, but District did not remove the teachers from Norton's room either (so that she received the same poor treatment as Selan even though she was not disabled).

Nor does Selan offer any other examples of discrimination against disabled persons, or any evidence that District's given reasons for its actions (that Selan's requested transfer was logistically impossible and that her tenure track change was pursuant to policy) were a pretext for discrimination. In the end, then, summary judgment in District's favor is clearly appropriate on Count I.

### Count II: Hostile Work Environment

On then to Selan's second theory of recovery, that of "hostile work environment." Before the substance of that concept is addressed, two threshold arguments advanced by District call for brief discussion.

First, District argues that hostile work environment claims are not cognizable under the ADA. On that score our Court of Appeals' decisions in several hostile work environment claims have expressly been based on the assumption that such a claim exists (see, e.g., Silk, 194 F.3d at 803-04) without actually deciding the issue. Absent a ruling that such a claim is not cognizable, there is no reason for this Court to so hold.

Second, District argues that Count II should fail because it was never mentioned in the EEOC charge (see D. St. Exs. 3, 4). It is true that a plaintiff cannot generally advance a position that was not tendered in the EEOC charge, but such issues are still includable in the ensuing litigation "if there is a reasonable

relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge" (Cheek v. W. & S. Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994)). While Selan did not employ the term "hostile work environment" in her EEOC charge, in the course of describing her other charges she does mention all of the same people and all of the same incidents as are the subject of Complaint Count II (see Compl. ¶¶53-57; D. St. Ex. 4 ¶¶30-32). That suffices to fulfill the purposes of the rule (see Cheek, 31 F.3d at 500), so that Count II cannot be dispatched on that basis.

But that ground of recovery fails as a substantive matter. Selan claims that her work environment was hostile because (1) District asked her to sign a medical release (which, according to Selan, violated both the ADA and the Medical Patients Rights Act, 410 ILCS 50/3(d)) and (2) she suffered from "bullying" by the three extraneous teachers and certain school administrators (see Compl. ¶¶53-57). District responds that such behavior was not "objectively hostile" under the standard set out by our Court of Appeals, and Selan offered no reply.

As stated earlier, Silk, 194 F.3d at 804 teaches that to prevail on a hostile work environment claim, "a plaintiff must show that his or her work environment was both subjectively and objectively hostile." For Rule 56 purposes Selan's assertion that she subjectively perceived her work environment to be abusive (id. at 805) must be credited, but the requirement of objective hostility sets a much higher bar. As Silk, id. at 804 (internal quotation marks, brackets and citations omitted)

18

has explained:

> An objectively hostile environment is one that a reasonable person
> would find hostile or abusive. In determining whether a plaintiff has
> met this standard, courts must consider all the circumstances,
> including the frequency of the discriminatory conduct; its severity;
> whether it was physically threatening or humiliating; or a mere
> offensive utterance; and whether it unreasonably interferes with an
> employee's work performance. Of course, the law does not prohibit all
> verbal or physical harassment in the workplace. To amount to hostile
> workplace environment, the harassment must be so severe or
> pervasive as to alter the conditions of the victim's employment and
> create an abusive working environment.

Here the conduct about which Selan complains simply does not meet that standard. Asking Selan to sign a medical release is simply not "severe and pervasive" harassment. And however the "bullying" by District's teachers and administrators may have troubled Selan, it is not <u>objectively</u> hostile behavior that would cause a reasonable person to have the reaction she has described. District's District's motion is therefore granted on Count II as well.

## Count III: Failure To Accommodate

To present a prima facie case for failure to accommodate under the ADA, as Count III asserts, Selan "must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability" (<u>EEOC v. Sears, Roebuck & Co.</u>, 417 F.3d 789, 797 (7th Cir. 2005)). Although District does not challenge the first two elements, it argues that its actions did not deny Selan reasonable accommodations.

Analysis of that issue is made more difficult by a lack of total clarity in Selan's claims as to what her requested accommodations were. But this Court

19

believes it has identified three asserted deficiencies on District's part: (1) "failing to extend her FMLA [leave] for no reason, which effectively ended her employment with the school district" (Compl. ¶59), (2) failure to transfer Selan to a vacant position (S. Mem. 9) and (3) failure "to come up with a plan allowed [sic] her to teach without the distractions of three other teachers entering and exit [sic]" (id.). With all reasonable inferences drawn in Selan's favor, there is at least a genuine issue of material fact as to whether District failed to accommodate her.

Ekstrand addressed a similar situation. There plaintiff Ekstrand (also a schoolteacher) suffered from seasonal affective disorder and had difficulty functioning in a room with artificial rather than natural light (583 F.3d at 973). Ekstrand repeatedly requested a transfer to a classroom with natural light, and her doctor specifically informed the defendant school district of the importance of natural light for her disorder, but the school district offered her only other accommodations that did not provide her with a classroom with natural light (id. at 973-76). In those circumstances our Court of Appeals held that despite the school district's seemingly good faith efforts to provide other accommodations, once Ekstrand's doctor informed the school district that a room with natural light was the only remedy for her disorder, "the school district was obligated to provide Ekstrand's specifically requested, medically necessary accommodation, unless it would impose an undue hardship on the school district" (id. at 977 (internal quotation marks omitted)).

Both the circumstances and the ruling in Ekstrand are analogous to the

situation here. Selan had detailed her issues to District's administration, including telling them about her previous issues "working off the cart" and her reasons why she felt that the screens would not work. And Selan's doctor had multiple communications with District in which he detailed Selan's problems and specifically stated that the screens were not an adequate solution. While it may have been reasonable in the first instance for District to offer Selan accommodations such as a room partition or screen, once Selan's doctor specifically informed them that was not an appropriate solution, those accomodations could no longer be held reasonable as a matter of law.

District argues that a transfer of Selan[10] or a reassignment of the other teachers was not possible due to the lack of vacant positions for Selan to fill and vacant rooms for relocation of the other teachers. Although those contentions may eventually prove to be true, there is at least a genuine issue of material fact as to the possibility of such accommodations.

District also contends that it was Selan who was responsible for the breakdown of the interactive process (see Ekstrand, 583 F.3d at 976), pointing out her failure to accept their proposals and her doctors' testimony that they were not

---

[10]  District originally argued that the ADA did not require it to transfer Selan.  But in the intervening months since District advanced that position in its brief, EEOC v. United Airlines, Inc., 693 F.3d 760, 761 (7th Cir. 2012) reversed our Court of Appeals' prior position by announcing that court's unanimous holding "that the ADA does indeed mandate that an employer appoint employees with disabilities to vacant positions for which they are qualified, provided that such accommodations would be ordinarily reasonable and would not present an undue hardship to that employer."

sure (or could not recall) why she could not have tried the screens. But given the complicated series of communications here, again there is a genuine factual issue on that point.

Finally, District argues that Selan's doctors did not know (or could not recall) exactly what Selan told them about the screens and did not currently know why she could not have tried them (see D. St. ¶¶55-65). But given Dr. Goldin-Mertogan's statements to District when the events were actually taking place (as opposed to years later in a deposition, where he admitted that he did not always recall the details of the situation), it would at least be possible for a reasonable jury to find in favor of Selan on that point.

In sum, each of several paths leads to the upholding of Count III against an attack on legal grounds. Hence District's motion is denied as to Count III.

## Count IV: Retaliation

As to the Count IV contention that Selan was the victim of retaliation, District first seeks to prevail because Selan did not include a charge of retaliation in her EEOC complaint. But as already discussed with respect to Count II, a plaintiff can still bring a claim that was not included in her EEOC charge under the condition discussed in <u>Cheek</u>, 31 F.3d at 500. As with Count II, despite the absence of a specific "retaliation" claim from Selan's EEOC charge, the same underlying events were alleged there. So Count IV also does not fail on that ground.

In substantive terms Selan may establish retaliation under either the direct or the indirect method of proof (<u>Dickerson</u>, 657 F.3d at 601). Under the direct

method "a plaintiff must show (1) [s]he engaged in a statutorily protected activity; (2) [she] suffered an adverse action; and (3) a causal connection between the two" (id.), while under the indirect method, a plaintiff must show "[s]he (1) engaged in protected activity; (2) was performing [her] job satisfactorily; and (3) was singled out for an adverse employment action that similarly situated employees who did not engage in protected activity did not suffer" (id. at 601-02). In either event, "[o]nce a plaintiff satisfies [her] initial burden, the burden then shifts to the defendant to present a non-invidious reason for the adverse employment action. If the defendant meets this burden, the plaintiff must then demonstrate that the defendant's proffered reason was pretextual" (id. at 602).

This opinion will examine both the direct and indirect methods in those terms. Only brief analysis is needed to show that Selan loses under each.

First, under the direct method, even on the assumption that Selan has shown both protected activity and an adverse action, she has failed--even with reasonable inferences--to show any causal connection between the two. Selan points to nothing other than a mere temporal relationship between her complaints and the alleged adverse action. While timing is one factor to consider, Mobley v. Allstate Ins. Co., 531 F.3d 539, 549 (7th Cir. 2008) is among the authorities that have made clear that in most cases "[e]vidence of temporal proximity . . . standing on its own, is insufficient to establish a causal connection for a claim of retaliation." Nothing here even hints that this case should be an exception to that principle.

Second, under the indirect method, Selan has not pointed to any similarly-

23

situated person as a point of comparison.  To that end Selan "need not show complete identity in comparing [herself] to the better treated employee, but [she] must show substantial similarity' (<u>Humphries v. CBOCS West, Inc.</u>, 474 F.3d 387, 405 (7th Cir. 2007), quoting <u>Radue v. Kimberly-Clark Corp.</u>, 219 F.3d 612, 618 (7th Cir. 2000)).  As <u>Humphries</u>, <u>id</u>, stated, "the purpose of the similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable:  complaints about discrimination."  What a court must do is apply a "'common-sense' factual inquiry," essentially asking "are there enough common features between the individuals to allow a meaningful comparison?" (<u>id</u>.).

Here Selan has failed to identify any appropriate similarly-situated person as a comparator, so that she fails under the indirect method of proof as well. Accordingly District prevails as a matter of law on Count IV, just as it has on Counts I and II.

## Conclusion

In light of the poor quality of the submissions on Selan's behalf, she has been fortunate to escape the total defeat of her case.  Instead, although this extended discussion has demonstrated the untenability of Selan's Counts I, II and IV as a matter of law, Count III survives because of the existence of genuine issues of

material fact.  This action is set for a next status conference at 9:15 a.m.

January 23,  2013.

_____
Milton I. Shadur
Senior United States District Judge

Date:  January 11, 2013